ALEXIS, INC.; Blue Diamond Dolls, Inc.; M & L South Enterprises, Inc.; Restaurant Concepts of Clearwater, Inc.; Silk Stockings Enterprises, Inc.; Theresa Lynn Kammer; and John Doe, Plaintiffs,

v.

PINELLAS COUNTY, FLORIDA; Everett Rice as Sheriff of Pinellas County, Florida; and Pinellas County Department of Consumer Protection, Defendants.

No. 8:98–CV–672–T–TBM.

United States District Court,
M.D. Florida,
Tampa Division.

March 29, 2002.

*ORDER*

McCOUN, United States Magistrate Judge.

THIS MATTER is before the court on Defendant Everett S. Rice's **Dispositive Motion for Summary Judgment** (Doc. 84), Plaintiffs' response in opposition (Doc. 88), **Plaintiffs' Dispositive Motion for Summary Judgment** (Doc. 85), and Defendant Rice's response in opposition (Doc. 93). Defendant Pinellas County has failed to respond to either motion.[1] Oral arguments on the motions were heard on June 19, 2001. Plaintiffs' motion is supplemented by affidavits and incorporates by reference factual matters previously asserted in support of their efforts to obtain injunctive relief. *See* (Docs.10–13, 27, 40).

I.

Plaintiffs Alexis, Inc. (d/b/a "Showgirls"), Blue Diamond Dolls, Inc. (d/b/a "Diamond Dolls"), M & L South Enterprises, Inc. (d/b/a "Gaslight Lounge"), Restaurant Concepts of Clearwater, Inc. (d/b/a "Dancers Show Bar" and "Christine's Cabaret"), and Silk Stockings Enterprises, Inc. (d/b/a "Silk Stockings"), operate adult entertainment establishments in Pinellas County, Florida. By the allegations, Plaintiff Theresa Lynn Kammer was a dancer who performed at one of these establishments, and she purports to represent all dancers similarly situated. Plaintiff "John Doe" purports to represent patrons who attend the performances at such establishments.

Defendants are Pinellas County, Florida, the Pinellas County Department of Con-

David Scott Boardman, Frank de la Grana, P.A., Tampa, FL, John William MacKay, P.A., Tampa, Fl, Luke Charles Lirot, P.A., Tampa, FL, H. Louis Sirkin, P.A., Tampa, FL, for Plaintiffs.

Carl E. Brody, Jr., Pinellas County Atty's Office, Clearwater, FL, for Defendants.

1. Also pending before the court is **Defendants' Motion to Dismiss and Motion in Limine** (Doc. 97) filed by Pinellas County and Plaintiffs' response in opposition (Doc. 101). Insofar as the motion seeks a dismissal of the claim of insufficient predicate, it is hereby **DENIED.** Insofar as the motion seeks to limit the issues and evidence for trial, ruling is **DEFERRED.**

sumer Protection (hereinafter collectively "Pinellas County"), and Everett Rice, in his official capacity as Sheriff of Pinellas County, Florida (hereinafter "Sheriff's Department").

The undisputed facts establish that between 1990 and 1998, the Pinellas County commission enacted several ordinances intended to govern the zoning, licensing, and regulation of adult uses within its boundaries. The principal ordinances at issue in this suit are codified in the Pinellas County Comprehensive Adult Use Regulation Ordinance, Pinellas County Code §§ 42–51, *et seq.*, and the Pinellas County Alcohol and Nudity Ordinance, Pinellas County Code § 6–2 (hereinafter, collectively, "ordinances"). In 1998 and 1999, the Sheriff's Department conducted undercover investigations of Plaintiffs' establishments which resulted in a number of mass arrests of dancers and some male employees and an occasional patron for alleged violations of provisions of the ordinances.[2] Some of the arrests occurred during specially promoted events. All the arrests were full custodial arrests under Florida law and resulted in the removal of the arrested individuals from the premises. The arrests which resulted in formal criminal charges and convictions were tracked by Pinellas County. By these ordinances, each arrest resulting in a conviction had implications to the licenses of the Plaintiff establishments.

As a consequence of the Sheriff Department's enforcement activities and Pinellas County's regulatory actions, Plaintiffs filed

suit seeking declaratory and injunctive relief, as well as damages for alleged violations of their constitutional rights. Specifically, Plaintiffs seek an Order declaring the ordinances unconstitutional and enjoining further enforcement activities upon allegations that the ordinances violate their First, Fourth, Fifth, and Fourteenth Amendment rights. They allege that the ordinances are unconstitutional because they lack a proper predicate and thereby deny Plaintiffs substantive due process (Count I); Ordinance 91–8, Sections 2.8.2, 2.1.6, and 7.3 violate their constitutional rights to be free from unreasonable searches and seizures (Count II); the ordinances grant unbridled discretion to the administrative officer in the enforcement provisions (Count III); they provide for liberal construction and unbridled administrative discretion (Count IV); they constitute an unlawful taking (Count V); the special licensing and zoning provisions for adult entertainment establishments violate equal protection (Count VI); various terms used in the ordinance are unconstitutionally vague (Count VII); the ordinances are unconstitutionally overbroad (Count VIII); and the ordinances were enacted improperly and in violation of Florida Statutes section 125.66 (Count IX). Additionally, Plaintiffs allege that the Sheriff Department's policy, custom, and practice in enforcement of the ordinances are actionable on a claim for damages brought pursuant to 42 U.S.C. §§ 1983 and 1985 (Count X). As for all counts, Plaintiffs seek an award of attorney's fees under 42 U.S.C. § 1988 (Count XI).[3]

---

**2.** The parties do not dispute the dates and times and locations of these arrests, but they present very different characterizations of the manner in which the arrests were effectuated. *See supra* 1349 n. 13. The total number of such investigations/group arrests appears to be 25, with a total of more than 143 dancers or other employees being arrested for violations of the ordinances.

**3.** The original claims have been somewhat narrowed. At the hearing on June 19, 2001, the Plaintiffs advised that their takings claim asserted in Count V was withdrawn. *See* (Doc. 100). By its Order (Doc. 65) of October 1, 1999, this court dismissed Plaintiffs' claim in paragraph 135 of Count X of the complaint, which alleged that the Defendants "invoked a custom, policy, or practice of devising, implementing, and enforcing unjustified, overly

## II.

By its motion for summary judgment, the Sheriff's Department first seeks summary judgment on the grounds that Plaintiff corporations lack standing under section 1983. Beyond the standing issue, it denies that its enforcement of the ordinances constituted actionable harassment so as to give rise to a claim under section 1983. More specifically, the Sheriff's Department argues that the arrests were based on probable cause, i.e., the personal observations of members of its vice unit for violations of the ordinances. It further contends that the so-called "raids" or "invasion" of Plaintiffs' premises resulting in "full custodial arrests" were actually reasonable under the circumstances and based upon legitimate law enforcement determinations that such mass arrests were an efficient use of resources and caused the least amount of business interruption at the clubs. Finally, it denies that Plaintiffs establish that the alleged violations were the result of any policies, customs, or practices.

In their response and by their cross motion for summary judgment, Plaintiffs urge that as corporate licensees, they do have standing to bring a section 1983 action. They also assert that the ordinances, as enforced, impose a "chilling effect" on Plaintiffs' properly licensed businesses and that the Sheriff's Department's enforcement actions constitute prior restraints in violation of the First Amendment. Plaintiffs dispute the Sheriff's Department's

claim that the multiple raids and full custodial arrests were reasonable and served an interest in efficiency. Instead, they assert that such raids, particularly during specially promoted or "premium" events, were conducted in egregious fashion and with the intent to maximize the harassment and disruption of Plaintiffs' businesses and that such entries were warrantless searches in violation of the Fourth Amendment. Attacking the ordinances themselves, Plaintiffs argue that the subjects included within the ordinances' purview are preempted by Florida Statutes section 847.09. Finally, Plaintiffs urge that various provisions of the ordinances are unconstitutionally vague and overbroad. Relying on this court's rationale in *Blue Moon Enterprises, Inc. v. Pinellas County Department of Consumer Protection*, 97 F.Supp.2d 1134 (M.D.Fla.2000), they urge that sections 42–108, 42–136, 42–144, and 42–145 of the Pinellas County Code are all unconstitutional.

## III.

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court may look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," in determining whether summary judgment is appropriate. Fed.R.Civ.P. 56(c). The movant

burdensome, contradictory, and ever-changing regulations applicable to adult entertainment establishments and these plaintiffs in a concerted effort to drive these plaintiffs out of business." (Doc. 1 ¶ 135) (emphasis in the original). The Order held that while Plaintiffs may raise constitutional challenges to the manner and effect of the Sheriff's enforcement of the adult use ordinances, the mere fact of his enforcement as mandated by Florida Statutes section 30.15 does not, in itself,

constitute a violation of Plaintiffs' constitutional rights. *See* (Doc. 65 at 3, 4). The court also dismissed the claims of Plaintiffs Theresa Kammer and "John Doe," as asserted in Count X, upon a finding that their individual claims failed to satisfy the pleading requirements of Rule 8. *Id.* at 4. Neither availed themselves of the opportunity to file an amended complaint. Additionally, the court dismissed Plaintiffs' claim for punitive damages. *Id.*

bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 918 (11th Cir.1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir.1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. *See Perkins v. School Bd. of Pinellas County,* 902 F.Supp. 1503 (M.D.Fla.1995). It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e).

When deciding a motion for summary judgment, "[i]t is not part of the court's function ... to decide issues of material fact, but rather determine whether such issues exist to be tried ..." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." *Hairston,* 9 F.3d at 919 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. *See Hairston,* 9 F.3d at 921; *see also Little v. United Technologies, Carrier Transicold Div.,* 103 F.3d 956, 959 (11th Cir.1997). All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997).

IV.

A.

As a threshold matter, Defendants challenge corporate Plaintiffs' standing to prosecute this action. Defendants rely on *L.S.T., Inc. v. Crow,* 49 F.3d 679 (11th Cir.1995), and argue that "[a] corporation is not a 'citizen' entitled to the privileges and immunities secured by federal law for purposes of § 1983." *Id.* at 682 n. 6 (citing *Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 514, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). While this statement is facially correct, it does not resolve the standing issue.

 Corporations may possess standing to assert due process violations under section 1983. *See Grosjean v. Am. Press Co.,* 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936). As recognized in *Grosjean,* while corporations are not 'citizens' within the meaning of the privileges and immunities clause of the Fourteenth Amendment, they are 'persons' within the meaning of the equal protection and due process of law clauses of this amendment and the freedom of speech guaranteed by the First Amendment is safeguarded from infringement by the due process clause of the Fourteenth Amendment. *Id.* at 243–44, 56 S.Ct. 444. In determining whether a plaintiff has standing to assert other constitutional violations pursuant to a section 1983 claim, the court must undertake a "zone of interests inquiry to determine whether a particular constitutional provision creates rights by Congress to be enforceable under § 1983." *Church of Scientology Flag Serv. Org. v. City of Clearwater,* 2 F.3d 1514, 1526 (11th Cir. 1993). To have standing, there must only be a more-than-marginal relationship between the plaintiff's legal interest that may entitle him to relief and the purpose implicit in the substantive constitutional or statutory provision. *Id.* (citing *Ass'n of*

*Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)).

■ Here, there is little question that the Plaintiffs' interests in challenging the constitutionality of the ordinance which regulates their operations bears a substantial relationship to the constitutional protections asserted.[4] Contrary to Defendants' contention that this action is fundamentally one asserted under the privileges and immunities clause of the Fourteenth Amendment, it is instead primarily a due process of laws challenge to the ordinances and their enforcement by the Sheriff's Department in alleged violation of the First, Fourth, and Fourteenth Amendments. The decision in *Grosjean* clearly establishes that the fundamental rights "safeguarded by the first eight amendments against federal action, [are] also safeguarded against state action by the due process of law clause of the Fourteenth Amendment. . . ." *Id.* at 243–44, 56 S.Ct. 444. Here, the Plaintiffs' interest in preserving their rights against the alleged violations are more than marginally related to each of the constitutional provisions asserted, including the alleged First and Fourth Amendment abuses against the dancers. *Cf. Church of Scientology,* 2 F.3d at 1526. Under such circumstances, the Plaintiffs possess standing to assert the claims raised in this action. *Cf. Lev-*

*erett v. City of Pinellas Park,* 775 F.2d 1536, 1539 (11th Cir.1985).

### B.

Plaintiffs initially contend that the enforcement provisions of the ordinances are preempted by Florida Statutes section 847.09, which provides in pertinent part:

> In order to make the application and enforcement of ss. 847.07—847.09 uniform throughout the state, it is the intent of the Legislature to preempt the field, to the exclusion of counties and municipalities, insofar as it concerns exposing persons over 17 years of age to harmful motion pictures, exhibitions, shows, representations, and presentation. To that end, it is hereby declared that every county ordinance and every municipal ordinance adopted prior to July 1, 1973, and relating to said subject shall stand abrogated and unenforceable on and after such date and that no county, . . . shall have the power to adopt any ordinance relating to the subject on or after such effective date.

Fla. Stat. ch. 847.09(1). Plaintiffs argue that this state law, which provides different procedural safeguards and elements of scienter, preempts and renders the ordinances unenforceable. The court disagrees.

■ Chapter 847 of the Florida Statutes preempts county authority to regulate *obscene* exhibitions and shows. It does not

---

4. Indeed, Plaintiffs' businesses, which promote dance activity recognized as protected to some degree by the First Amendment, are highly regulated by the ordinances they seek to challenge. With respect to the enforcement of the ordinances, Plaintiffs demonstrate that their dancers and other employees were subjected to arrest while on the job and with at least arguable support, demonstrate that the arrests by the Sheriff's Department were conducted to maximize their impact on the economic well-being of the businesses. Thus, by the Plaintiffs' argument, the ordinances, as

enforced, have a chilling effect on their First Amendment rights, result in prior restraint of First Amendment protected activity, and offer an effective means of harassing the business in addition to the affected employees. For purposes of the standing issue, this court concludes that there is more than a marginal relationship between Plaintiffs' legal interests and the rights of Plaintiffs' dancers and employees to be free from infringement of their First Amendment rights, as well as unreasonable searches and seizures.

preempt the county's authority to regulate adult use establishments; indeed, were Plaintiffs to argue that the obscenity statute governs the performances given at their establishments, they would likely destroy any claim to protection under the First Amendment. *See City of Daytona Beach v. Del Percio,* 476 So.2d 197, 201 (Fla.1985) ("Likewise, chapter 847, Florida Statutes (1983), which expressly preempts county ... authority to regulate, inter alia, obscene exhibitions, does not preempt the authority to regulate the nonobscene exposure of the female breast below the top of the areola."); *see also Stall v. State,* 570 So.2d 257 (Fla.1990). Accordingly, Plaintiff's claim of ordinance invalidation by preemption or illegality of arrests for failure to follow the procedural requirements of section 847.08 is without merit.

### C.

■ By their cross motions, the parties address the constitutional significance of the warrantless arrests of Plaintiffs' dancers and other employees on several occasions in 1998, 1999, and 2000.[5] Plaintiffs argue that the custom and practice of the Sheriff's Department in making mass full custodial arrests[6] of dancers for violation of the ordinances during or prior to the completion of their evening performances and without a preliminary and independent determination of probable cause constitutes a prior restraint in violation of the First Amendment. According to the Plaintiffs, the circumstances of these group arrests also have a significant chilling effect on their First Amendment pro-

tected commercial activity. Plaintiffs cite to *Attwood v. Purcell,* 402 F.Supp. 231 (D.Ariz.1975), where the court found that custodial arrests of dancers during the performance or immediately thereafter for violation of the state lewdness statute constituted "the most effective form of prior restraint." The court reasoned that the arresting officer acts as a censor and precludes further performances by the dancer while she is being processed through booking and bail procedures. *Id.* at 237.

In contrast, the Sheriff's Department argues that the arrests at issue here were based on the personal observations by deputy Sheriffs of violations of the ordinances and thus probable cause. As such, the arrests were lawful under *Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). Because the arrests themselves did not give rise to statutory or constitutional violations, it follows that there was no violation by the Sheriff's Department and thus no liability under section 1983. *See City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *Wyke v. Polk County Sch. Bd.,* 129 F.3d 560, 568 (11th Cir.1997). In any event, the Sheriff's Department justifies the practice of mass full custodial arrests as a command decision based upon the reasonable law enforcement determination that such practice was (and is) a more efficient use of department resources and was (and is) less disruptive to the Plaintiffs' businesses.

The constitutional challenge here is an as applied challenge to the Sheriff's Department's enforcement of the ordinances.[7]

---

**5.** According to the submissions, the arrests at issue here were most commonly for a dancer's exposure of specified anatomical areas, such as the cleavage of the nates of her buttocks, simulated sex acts, and violation of the three-foot rule of the ordinances. Where another employee was arrested, it appears that the basis of the charge was generally for per-

mitting or suffering a dancer to violate the ordinance.

**6.** For a discussion of the various meanings of "arrest" in the contemplation of the Florida courts, *see Thomas v. State,* 614 So.2d 468, 470–71 (Fla.1993).

**7.** Plaintiffs also complain that the arrests were not "immediate" as prescribed by Flori-

The factual circumstances [8] surrounding such enforcement present an interesting clash between First, Fourth and Fifth Amendment principles. From a purely Fourth Amendment perspective, the arrests appear lawful. *See Atwater,* 532 U.S. at 321–22, 121 S.Ct. 1536 ("[T]he probable cause standard applies to all arrests, without the need to balance the interests and circumstances involved in particular situations.... An officer may arrest an individual without violating the Fourth Amendment if there is probable cause to believe that the offender has committed even a very minor criminal offense in the officer's presence.") (citing *Dunaway v. New York,* 442 U.S. 200, 208, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). However, several courts addressing similar circumstances have denounced the full custodial arrests of exotic dancers for violating public indecency or obscenity ordinances as violative of First Amendment principles. *See Attwood v. Purcell,* 402 F.Supp. 231 (D.Ariz. 1975); *SOB, Inc. v. County of Benton,* 171 F.Supp.2d 978 (D.Minn.2001); *Admiral Theatre v. City of Chicago,* 832 F.Supp. 1195 (N.D.Ill.1993); *People v. Adais,* 114 Misc.2d 773, 452 N.Y.S.2d 543 (N.Y.Crim. Ct.1982).[9] While the Supreme Court has yet to squarely address the issue, as discussed below, it has recognized a significant interplay between the First, Fourth, and Fifth Amendments in these matters. *See Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973); *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985).

In the context of allegedly obscene books and films, the Supreme Court has made it abundantly clear that the *warrantless* seizure of such obscene material is an impermissible prior restraint under the First Amendment and therefore an unreasonable seizure in violation of the Fourth Amendment. *See Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973); *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973). In *Roaden,* the Court stated that the "precipitate action by a police officer" in seizing a suspected obscene film without the authority of a warrant, "is plainly a form of prior

da law and otherwise were contrary to an administrative order of the circuit court in Pinellas County, Florida establishing uniform procedures for the prosecution of ordinances. *See* Fla. Stat. ch 901.15 ("A law enforcement officer may arrest a person without a warrant when: (1)[t]he person has committed a ... or violated a municipal or county ordinance in the presence of the officer. An arrest for the commission of ... violation of a municipal or county ordinance shall be made immediately or in fresh pursuit."); Administrative Order No. PI–CTY–98–07. While these assertions appear to be well-founded, they do little to advance the constitutional claim.

8. The undisputed facts before the court establish that the arrests were the product a Sheriff's Department custom or established practice of making mass arrests following an undercover investigation at adult dance clubs. The arrests were made without the benefit of arrest warrants. Instead, in every instance, the arrest was founded upon the personal observations of an undercover officer and his or her determination that probable cause existed for the arrest of such dancer or employee on a violation of the ordinances. The arrests were made en masse. The degree of disruption caused by these arrests is disputed by the parties; however, the arrests were undeniably disruptive to further dance performances by each of those dancers arrested for some period of time while she was processed and released on bail or otherwise. To the extent their dancers were arrested, the Plaintiffs suffered a loss of some dance performances until the dancers' return.

9. At least two courts have concluded that such arrests were not prior restraints. *See Kew v. Senter,* 416 F.Supp. 1101 (N.D.Tex. 1976); *Furfaro v. City of Seattle,* 144 Wash.2d 363, 27 P.3d 1160 (2001).

restraint and is, in those circumstances, unreasonable under Fourth Amendment standards." *Roaden*, 413 U.S. at 504, 93 S.Ct. 2796. The seizure was unreasonable not only because a warrant was easily obtainable, but because the prior restraint of the right of expression, by books or films, "calls for a higher hurdle in the evaluation of reasonableness." *Id.* However, it is not at all clear that the Court will apply the same treatment or standards to the arrest of exotic dancers based on the content of their performances. In *Maryland v. Macon*, the Court expressly declined to address whether a warrant was required to arrest a suspect on obscenity-related charges, *see Macon*, 472 U.S. 463, 467, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), and the Court has yet to stake out bright lines in regards to the constitutional protections to be afforded nude dancing in this regard.[10]

■ The degree of protection afforded nude dancing by the First Amendment appears minimal at best. Most recently, the Court has stated: "[N]ude dancing of the type at issue here is expressive conduct, although we think it falls only within the outer ambit of the First Amendment's protection." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S., at 565–66, 111 S.Ct. 2456; *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 68, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981)). Whatever it may be, the degree of protection afforded by the First Amendment to expressive conduct depends upon the presence of a "communicative element." *See California v. LaRue*, 409 U.S. 109, 117, 93 S.Ct. 390,

34 L.Ed.2d 342 (1972) (citing *O'Brien*, 391 U.S. at 376, 88 S.Ct. 1673).[11] In *La Rue*, the Court suggests that "... as the mode of expression moves from the printed page to the commission of public acts that may themselves violate valid penal statutes, the scope of the permissible state regulations significantly increases." *See also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 933–34, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). The clear implication of the cases addressing nude dancing of the type here at issue is that such performances, being predominately conduct rather than expression, simply have less intrinsic value in contemplation of the First Amendment, and thus, the dancers and their employers simply command less constitutional protection from regulatory and enforcement actions than is afforded to other forms of expression.

While this court has struggled with the resultant disparity that such a conclusion brings, because the expressive conduct of such dancers is deserving of only minimal protection in relation to other forms of expression, it is concluded, that where, as here, the violation has occurred in the presence of the deputy, there is no heightened standard of probable cause requiring the interposition of a judge or warrant before the deputy may act to arrest the dancer.

■ The court reaches this conclusion with full recognition and respect that First Amendment case law holds that "any system of prior restraint ..., 'comes to the Court bearing a heavy presumption against its constitutional validity.'" *See Southeastern Promotions, Ltd. v. Conrad*,

---

10. The term, "nude dancing," as used in the case law is something of a misnomer in the context of this case. Here, by reason of the prohibitions in the ordinances, there is no nude dancing as such and all the dancers perform partially clad.

11. In *O'Brien*, the Court stated, "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *O'Brien*, 391 U.S. at 376, 88 S.Ct. 1673.

420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Further, the court is fully cognizant that "[t]he use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new." *Stanford,* 379 U.S. at 484, 85 S.Ct. 506 (citing *Marcus v. Search Warrants of Property at 104 East Tenth St., Kansas City, Mo.,* 367 U.S. 717, 724, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961)). In the context of adult dance clubs, the power of arrest can serve similarly to suppress such unpopular activity. However, the protections of the First Amendment are not absolute, and prior restraints are not unconstitutional per se. *See Southeastern Promotions,* 420 U.S. at 558, 95 S.Ct. 1239. Merely labeling the Sheriff's Department's actions prior restraint does not end the inquiry.

■ Although the Court has not addressed the matter of prior restraint in a similar factual context, it has announced as a settled rule that "a system of prior restraint 'avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.'" *Id.* at 559, 95 S.Ct. 1239. Here, the court proceeds on the assumption that a practice of arrests such as occurred here can and did result in a prior restraint at least to the extent that some dance performances were lost to the dancers and the Plaintiffs for a period of time after each arrest.[12] Nevertheless, the court concludes that the restraint was not unconstitutional. Stated otherwise, even in the face of a loss of dance performances, the conduct of the deputies was lawful and the safeguards in effect were adequate to avoid constitutional infirmity even in the absence of a heightened standard of reasonableness requiring an arrest warrant.

Unlike those situations where the officer imposed his own considerations of obscenity or lewdness to remove a film or book entirely from public circulation, here the Sheriff's deputies were constrained by the Fourth Amendment standard of probable cause to arrest only those persons violating the ordinances in their presence. In this context, the type of violations at issue were readily identifiable and separable from the otherwise protected activity under an established and familiar standard. In these circumstances, the interposition of a warrant requirement would have made no difference to the outcome except as to delay the arrest. Further, the concern with prior restraints is that they result in an impermissible censorship of protected activity. It is significant here that there is no showing that other dancers on the premises who did not violate the ordinances were nonetheless arrested. Thus, it is evident that the deputies did not act impermissibly to effect the arrests of the dancers because they were engaged in an expressive dance, but instead because in the conduct of the dance, the dancer went beyond the pale of protected expression according to these ordinances. Regardless of the quantum of protection afforded the dancers by the First Amendment, they may not claim to be insulated from punitive actions against their misconduct merely because it occurred during a dance. As with the dancers, nor may the businesses claim immunity from the negative consequences of the lawful arrests of their dancers. Given the context, the court concludes that the probable cause standard, in the first instance, provides an adequate safeguard to First Amendment concerns.

---

12. The Sheriff's Department simply argues that the legal standard is probable cause and that the arrests were lawful, citing *Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). However, Atwater addressed only the Fourth Amendment aspects of arrest in a context which did not involve First Amendment considerations.

After the restraint is imposed, other safeguards kick in automatically. Promptly upon the dancers' arrests, the judicial system imposes its panoply of safeguards to assure the rights of the dancers are further protected and to minimize the censorship. Included in these rights is the right to release from custody through bail or otherwise and the right to thereafter contest the allegations. In this case, once the dancers were released, they were immediately free to again engage in their dance activities, and as noted above, those dancers not arrested were left by the deputies to continue the dance. Although the plaintiff businesses temporarily lost the services of the arrested dancers, and to that extent, their right to purvey such expressive material and make money therefrom, they were not closed down by these arrests, and significantly, none were prohibited from continuing to offer dance performances by other dancers. That the arrests were perhaps impermissibly abusive is for another claim. In sum, the court concludes that the actions of the Sheriff's Department in arresting dancers for whom there was probable cause for arrest did not present an impermissible prior restraint in violation of the First Amendment.

Accordingly, the Plaintiffs' motion is **DENIED** insofar as they seek summary judgment for their claim that the custodial arrests constituted prior restraint in violation of the First Amendment.

### D.

■ The cross motions also raise the issue whether Sheriff's Department's custom and practice of effecting mass full custodial arrests for alleged ordinance violations constitutes harassment in violation of Plaintiffs' First Amendment rights. These allegations are made in Count X, where the Plaintiffs seek compensatory damages for the harassment. Here, the Plaintiffs complain not just of the full cus-

todial arrests but of the improper motives of the Sheriff's Department and the abusive, threatening, and demeaning manner in which the arrests were carried out. They especially complain that the mass arrests were often made during specially promoted performances which they believe were targeted to have the maximum negative impact on the businesses and for the purpose of chilling their First Amendment protected activity.

In opposition, the Sheriff's Department, citing *P.A.B., Inc. v. Stack*, 440 F.Supp. 937 (S.D.Fla.1977), argues that there are no policies or customs by which it can be held liable for harassment pursuant to a section 1983 claim. Further, it contends that the evidence establishes that all the arrests were lawful, not overly frequent, and unaccompanied by such other conduct which might otherwise support a claim of harassment. In contrast to the Plaintiffs' contention regarding the malicious and censorial intent of this enforcement, the Sheriff's Department again cites to testimony of its supervisor that the decision to make arrests in this fashion was a command decision based on considerations of efficiency, manpower, and reduced disruption to the Plaintiffs' establishments.

■ Law enforcement actions which go beyond that necessary to enforce the laws and are designed to chill First Amendment rights constitutes harassment and infringe on First Amendment rights. *See Andree v. Ashland County*, 818 F.2d 1306, 1316 (7th Cir.1987); *SSDD Enterps., Inc. v. Village of Lansing*, No. 95 C 6064, 1998 WL 326727, at *12 (N.D.Ill. June 12, 1998); *P.A.B., Inc. v. Stack*, 440 F.Supp. 937, 944 (S.D.Fla.1977); *Maguin v. Miller*, 433 F.Supp. 223, 229 (D.Kan.1977); *Bee See Books, Inc. v. Leary*, 291 F.Supp. 622 (S.D.N.Y.1968); *see also Eagle Books, Inc. v. Ritchie*, 455 F.Supp. 73, 78 (D.Utah 1978). In *P.A.B.*, the court found a "clear,

continuous[,] and pervasive pattern of harassment" where law enforcement officers maintained a uniformed and plain-clothed presence at Plaintiffs' premises at frequent and continuing intervals, parked police cars in the vicinity of the businesses for hours at a time with lights flashing, and stopped and checked identification of patrons and employees. *See id.* at 939.

Here, the parties do not dispute the times and locations at which such group arrests occurred.[13] However, the parties proffer evidence suggesting very different characterizations of the manner in which the investigations and arrests in question were effectuated. For example, relying on a statement made by a prosecuting attorney in court proceedings in the Pinellas County Court, they urge proof that the aim of these arrests and resulting prosecutions was not really the punishment of the errant dancers but instead the licenses and operations of these establishments.[14] They further cite to an administrative order which they contend required the deputies to use an alternative notice to appear procedure rather than arrests to bring these persons before the county court for prosecution. A newspaper quote attribut-

able to a Sheriff's deputy suggests that the timing of at least one investigation was planned to coincide with the appearance of a well-known dancer. By Plaintiffs' proffer of evidence, the "raids" were conducted so as to be disruptive as possible, with the result of interrupting performances; frightening and intimidating customers; and frightening, intimidating, ridiculing, and demeaning employees, especially the female performers, by physically removing them out of the business premises and parading them in public view before their transport to jail. They urge that the circumstances indicate that it was more than happenstance that the raids at Diamond Dolls occurred during specially promoted "premium" or "feature" shows in order to have a maximum negative impact on Plaintiff Blue Diamond Dolls' business. *See* Affidavits of James Dato (Doc. 86, Exh. D), Richard Hill (Doc. 86, Exh. E), Herbert Sylvester (Doc. 86, Exh. F), attesting to the harassing manner in which the Pinellas County Sheriff's Office conducted the raids and the chilling effect on the performances offered by Plaintiffs and the monetary damages caused by the raids. *See also* (Docs.10–13, 27, 40).

---

**13.** The following instances are alleged: at Showgirls (owned by Plaintiff Alexis, Inc.), arrests occurred on March 5, 1998 (five arrests); May 11, 1998 (three arrests); October 18, 1998 (six arrests); September 14, 1999 (seven arrests). At Diamond Dolls (owned by Plaintiff Blue Diamond Dolls, Inc.), arrests occurred on February 20, 1998 (seventeen arrests); April 6, 1998 (six arrests); April 30, 1998 (six arrests); September 16, 1998 (thirteen arrests); July 30, 1999 (thirteen arrests); and September 17, 1999 (nine arrests). At the Gaslight Lounge (owned by Plaintiff M & L South Enterprises, Inc.), arrests occurred on February 10, 1998 (nine arrests); April 15, 1998 (seven arrests); August 12, 1998 (several arrests); May 19, 1999 (several arrests); March 1, 2000 (four arrests). At Dancers Show Bar, which became Christine's Cabaret (owned by Plaintiff Restaurant Concepts of Clearwater, Inc.), arrests occurred on Febru-

ary 6, 1998 (eleven arrests); April 22, 1998 (four arrests); May 8, 1998 (one arrest); May 14, 1998 (eleven arrests); June 24, 1998 (four arrests); November 20, 1998 (four arrests); and April 21, 1999 (six arrests). At Silk Stocking (owned by Plaintiff Silk Stockings Enterprises, Inc.), arrests occurred on January 27, 1998 (two arrests); April 15, 1998 (four arrests). *See* (Doc. 84 at 2, 3); Attachments to Affidavit of Jim Dato (Doc. 84, Exhibit 2).

**14.** This court has previously cited to this statement in the related proceeding in *Blue Moon:* "In one state proceeding, the prosecutor stated candidly that 'the big goal is against the licenses and the operation of the establishments themselves, not particularly the people who work in there.'" *See Blue Moon,* 97 F.Supp.2d at 1145 n. 10.

The Sheriff's Department proffers testimony which denies that its deputies specially targeted any special events and instead insist that such investigations were performed periodically as the vice unit's workload permitted. All arrests were based on deputies' personal observations of violations and made in a manner that was most efficient to the unit and least invasive and intrusive to the business. Patrons were left alone, and dancers were not abused. It denies that degree of conduct recognized as sufficient to warrant the court's intervention for harassment. *See* Affidavit of Sergeant George H. Henry, who details the manner in which the group arrests were planned and executed. *See* (Doc. 84, Exh. 9).

Upon consideration, the court finds the vastly divergent characterizations of the incidents raise genuine issues of material fact as to whether the raids constituted harassment and bad faith law enforcement for the purpose of inhibiting the exercise of First Amendment rights. Such disputed issues of fact preclude summary judgment, and thus, Defendant's motion for summary judgment is **DENIED** in this respect.

### E.

■■■ Plaintiffs next argue that the Sheriff's Department's custom or practice of entering upon the Plaintiffs' premises in the fashion described above "are the result of warrantless searches and unauthorized entries into the places of business" contrary to the Fourth Amendment. (Doc. 86 at 12). Plaintiffs cite to *J.L. Spoons, Inc. v. City of Brunswick*, 49 F.Supp.2d 1032 (N.D.Ohio 1999), in support of their contention that the limitless nature of inspec-

tions permitted by the ordinance violated the Fourth Amendment.

■■■ While the Fourth Amendment's prohibition on unreasonable searches applies to commercial premises, the expectation of privacy in commercial premises is different from and less than the expectation of privacy within the home. *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting *New York v. Burger*, 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)); *Crosby v. Paulk*, 187 F.3d 1339, 1345–46 (11th Cir.1999). This expectation of privacy is further reduced in the context of a closely regulated industry, such as the liquor industry. *See Crosby*, 187 F.3d at 1346.[15] For a warrantless administrative inspection to be reasonable, three criteria must be met: (1) the regulatory scheme must be based on a "substantial" government interest; (2) the warrantless inspections must be necessary to further the regulatory scheme, and (3) the inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. *Id.* "[W]arrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials." *Donovan v. Dewey*, 452 U.S. 594, 599, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), *quoted in Swint v. City of Wadley, Ala.*, 51 F.3d 988, 998 (11th Cir.1995).

It is beyond question that the United States Supreme Court has approved the regulation of such adult entertainment es-

---

**15.** Previously in this case, the court found the adult entertainment business of these Plaintiffs to be a closely regulated industry. *See* Order denying motion for preliminary injunction (Doc. 39 at 6). In contrast, the court in

*J.L. Spoons* stated that sexually oriented businesses do not qualify as highly regulated industries due to the protection afforded such businesses by the First Amendment. *Id.* at 1040.

tablishments upon the conclusion that it furthers a substantial governmental interest in preserving the morals and safety of the community or is necessary to combat the perceived secondary effects of such businesses. *Barnes,* 501 U.S. at 569, 111 S.Ct. 2456; *City of Renton v. Playtime Theatres,* 475 U.S. 41, 51–52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1985); *Wise Enterps., Inc. v. Unified Gov't of Athens–Clarke County, Ga.,* 217 F.3d 1360, 1363–64 (11th Cir. 2000).

Further, as was previously found by the court,

> Florida Statutes section 30.15 mandates that sheriffs perform duties that are imposed upon them by law, and section 42–61 of the Pinellas County code imposes a duty on the sheriff to enforce the ordinance:
>
> The sheriff is responsible for verifying information contained on an application pursuant to section 42–77(b) for inspecting any proposed, licensed or nonlicensed establishment in order to ascertain whether it is in compliance with applicable local ordinances and criminal statutes, including the provisions set forth in division 6 [miscellaneous prohibitions] of this article.

(Doc. 65 at 3) (quoting Pinellas County, Fla., Code § 42–61(c); Fla. Stat. ch. 30.15; 901.15(1)). Thus, under both state and local law, the Sheriff's Department's entry upon the premises is necessary to the fulfillment of its duties. This court declines to find otherwise merely because the entry is unannounced due to the necessities of the investigation. In the circumstances of these businesses, such undercover "inspection" is the norm rather than the exception and is simply not unreasonable. Finally, while the entries here may be described as random or unpredictable in frequency, Plaintiffs do not complain of their *infrequency,* and it is simply unreasonable for these Plaintiffs to complain that they had no real expectation that they would from time to time be inspected by the Sheriff's Department. In short, Plaintiffs are unable to demonstrate that the Sheriff Department's investigations constitute violations of the Fourth Amendment

### F.

As in *Blue Moon,* these Plaintiffs raise constitutional objections to portions of the ordinances. They urge that any arrest predicated on "any specified sexual activity," [16] on the basis of the "fondling or other erotic touching" of human genitals, pubic region, buttock, anus or female breast is subject to disparate enforcement due to the vagueness and overbreadth of these provisions and that the general strict liability requirements of sections 42–108, 42–136, 42–138 and 42–139,[17] 42–144, 42–145 are invalid upon the overbreadth and vagueness rationale employed by this court in *Blue Moon.* They further allege that because section 42–144's proscriptions are inextricably linked to these terms, the section is ripe for abusive enforcement and void for vagueness.[18]

▬▬ This court previously discussed vagueness and overbreadth in its *Blue Moon* decision. *See Blue Moon,* 97 F.Supp.2d at 1142–43. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294,

---

**16.** "Specified sexual activity" is defined at section 42–51 of the Code.

**17.** This court invalidated sections 42–138 and 42–139 in *Blue Moon.*

**18.** Plaintiffs allege in their complaint that a number of other terms contained in the ordinances are vague or overbroad. *See* (Doc. 1 ¶ 115). However, they do not raise or challenge the constitutionality of these terms by their motion for summary judgment.

33 L.Ed.2d 222 (1972). Laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." *Id.* at 108–09, 92 S.Ct. 2294; *see also City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). To succeed on a vagueness challenge, the complainant must demonstrate that the law is impermissibly vague in all of its applications. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Here, vagueness of the Code raises special First Amendment concerns because of its chilling effect on free speech. *See Reno v. American Civil Liberties Union,* 521 U.S. 844, 871–72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *see also United States v. Acheson,* 195 F.3d 645, 652 (11th Cir.1999).

 Overbreadth "results when lawmakers define the scope of a statute to reach both unprotected expression as well as, at least potentially, protected speech." *American Booksellers v. Webb,* 919 F.2d 1493, 1502 (11th Cir.1990). The overbreadth doctrine "protects the public from the chilling effect that . . . a statute has on protected speech." *Nationalist Movement v. City of Cumming, Forsyth County, Ga.,* 934 F.2d 1482, 1485 (11th Cir.1991), *quoted in Acheson,* 195 F.3d at 650; *see also American Booksellers Ass'n,* 484 U.S. at 392–93, 108 S.Ct. 636; *Grayned,* 408 U.S. at 114–15, 92 S.Ct. 2294. The court should employ the doctrine sparingly and only where the court finds the overbreadth of a statute "not only . . . real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick,* 413 U.S. at 613, 615, 93 S.Ct. 2908, *quoted in*

*Acheson,* 195 F.3d at 650; *see also Florida Video Xpress,* 983 F.Supp. at 1096 (citing *Daniel v. City of Tampa, Fla.,* 38 F.3d 546, 551 n. 10 (11th Cir.1994)). While the overbreadth doctrine "in effect requires courts to evaluate the *potential* reach of a statute, *conceivable* sets of circumstances, and *possible* direct and indirect burdens on speech," *American Booksellers,* 919 F.2d at 1499–1500 (emphasis in original), a statute should not be found invalid "because it is possible to conceive of a single impermissible application." *New York v. Ferber,* 458 U.S. 747, 772, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (quoting *Broadrick,* 413 U.S. at 630, 93 S.Ct. 2908 (Brennan, J., dissenting)). The court should not find a statute facially overbroad where the statute is "readily susceptible" to a narrowing construction that would make it constitutional. *See American Booksellers Ass'n,* 484 U.S. at 397, 108 S.Ct. 636; *Broadrick,* 413 U.S. at 613, 93 S.Ct. 2908.

Section 42–51 defines "specified sexual activity" to include, among other things, the "[f]ondling or other erotic touching of human genitals, pubic region, buttock, anus or female breast." Although the ordinance does not define "erotic," the court interprets the term in its ordinary, contemporary, and common meaning. *See Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).

The Oxford English Dictionary defines "erotic" as

A. *adj.* Of or pertaining to the passion of love; concerned with or treating of love; amatory.

Oxford English Dictionary (2d ed.1989), *available at http://dictionary.oed.com.*

Webster's Third International Dictionary defines it as follows:

1: of, devoted to, or tending to arouse sexual love or desire: as a: treating of or depicting sexual love . . . b: tending to excite sexual pleasure or desire . . . c:

directed toward sexual gratification ... d: strongly affected by sexual desire. Webster's Third Int'l Dictionary of the Eng. Language Unabridged 772 (1993).

 In this light, the Plaintiffs fail to demonstrate that the term, "erotic," as used in the ordinance in relation to "specified sexual activity," is impermissibly vague so that a person of ordinary intelligence will not know what is prohibited, nor is it overbroad as that term is employed in the law. While it is possible to conceive of an impermissible application of this part of the definition so as to reach protected and noncriminal conduct, that possibility does not dictate a holding that the provision is facially unconstitutional.

 Furthermore, except as to the prohibition at section 42–144(b), the overbreadth and vicarious liability analysis employed in *Blue Moon* is inapposite to either sections 42–144(a) or 42–145. However, as for § 42–144(b), it suffers the same defects in this regard as sections 42–138 and 42–139, provisions previously declared unconstitutional by the court. Thus, the provision seeks to imposed or allows for criminal sanctions, including the possibility of incarceration, upon persons bearing no responsible relationship to the prohibited conduct in section 42–145. *See Blue Moon*, 97 F.Supp.2d at 1145–46. Accordingly, section 42–144(b) is declared unconstitutional, but in all other respects, this aspect of Plaintiff's motion for summary judgment (Doc. 85) is **DENIED.**

## IV.

Accordingly, it is **ORDERED** that the Sheriff's Department's **Dispositive Motion for Summary Judgment** (Doc. 84) is **DENIED**, and that **Plaintiffs' Dispositive Motion for Summary Judgment** (Doc. 85)

19. A status conference to discuss dates for the Pretrial Conference and Trial of this cause

is **GRANTED** in part and **DENIED** in part as set out herein. Defendants are enjoined from the enforcement of section 42–144(b).[19]

will be scheduled by separate notice.