IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

PUTNAM COMMUNITY
MEDICAL CENTER,

      Appellant,

v.

FLORIDA BIRTH-RELATED
NEUROLOGICAL INJURY
COMPENSATION
ASSOCIATION, a/k/a NICA, and
JERRA MYRICK, individually
and as natural parent of
JAMYRAH DEBOSE, a minor,

      Appellee.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D16-32

Opinion filed December 5, 2016.

An appeal from the Division of Administrative Hearings
Barbara Staros, Administrative Law Judge.

David P. Ferrainolo of Hall Prangle & Schoonveld, LLC, Tampa, for Appellant.

Stephen A. Ecenia and Tana D. Storey of Rutledge Ecenia, P.A., Tallahassee for Appellee Florida Birth-Related Neurological Injury Compensation Association; Joshua T. Frick of Hogan Frick, Orlando, for Appellee Jerra Myrick, individually and as natural parent of Jamyrah Debose, a minor.

PER CURIAM.

      This case involves Florida's Neurological Injury Compensation Act

("NICA"), which exists to provide benefits to eligible infants who sustain severe

birth-related neurological injuries. Putnam Community Medical Center ("the hospital") challenges section 766.302(2) of NICA on state and federal equal protection grounds, arguing that it impermissibly discriminates between single and multiple gestation infants by utilizing different minimum weight thresholds as a basis for determining compensability. We affirm and write to explain why.

I.

Jamyrah Debose, an infant, suffered neurological injuries from a lack of oxygen to her brain during the birthing process. She was 39.5 weeks at delivery, and weighed 2,440 grams. As a cautionary first step to filing a medical malpractice lawsuit against the obstetrical physician and hospital, her mother, Jerra Myrick, filed an administrative petition for benefits under protest, seeking a determination of whether Jamyrah's injuries were compensable under NICA's plan. The administrative law judge ("ALJ") permitted intervention by the hospital, which claimed that its statutory immunity from civil suit—a benefit of "compulsory participation in NICA"—would dissolve if Myrick's claim was deemed non-compensable, leaving it open to potential liability in a civil lawsuit. The hospital contended it had a "vested, statutory and constitutional right and substantial interest in evaluating and presenting a factual and legal analysis concerning the nature of the condition of the minor and application of [NICA]."

Appellee, Florida Birth-Related Neurological Injury Compensation Association (the "Association"), filed a motion for summary final order, arguing that Jamyrah's injury was non-compensable because she was a product of single gestation and below the statutory minimum threshold of 2,500 grams; as such, she didn't suffer a "birth-related neurological injury," which is defined as:

> injury to the brain or spinal cord of a live infant weighing at least 2,500 grams for a single gestation or, in the case of a multiple gestation, a live infant weighing at least 2,000 grams at birth caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently and substantially mentally and physically impaired. This definition shall apply to live births only and shall not include disability or death caused by genetic or congenital abnormality.

§ 766.302(2), Fla. Stat.

The hospital opposed the motion, contending that a full evaluation on the compensability of the claim should be made because Jamyrah was "a normal weight newborn, the product of a mother small in stature, and strict observance to the 2500 weight qualification serves only to undermine the purpose of the Plan and intent of the legislature." Attached to the hospital's opposition was an affidavit of Dr. Frederick E. Harlass, a board certified OB-GYN, who the hospital contended would be "willing to testify that the 2500 gram requirement [was] unreasonable and arbitrary under the facts of this clinical situation." In his affidavit, Dr. Harlass attested that Jamyrah "clearly qualified for the NICA compensation pool,"

3

notwithstanding her birth weight; he further asserted that the statute's 2,500 gram requirement was intended to exclude infants of extreme prematurity and those with intrauterine growth retardation diagnosed with cerebral palsy, of which Jamyrah was neither. He concluded that Jamyrah's weight was normal for a baby born to a mother of small stature such as Myrick.

On December 7, 2015, the ALJ granted the Association's motion for a summary final order and dismissed Myrick's petition with prejudice, determining that the undisputed evidence showed that Jamyrah was a single gestation infant with a birth weight of less than 2,500 grams, making her unqualified for compensation under the Plan. The ALJ further concluded that the hospital's argument to depart from the strict construction of the statute was an equitable one, but the ALJ had neither the discretion to ignore a clear statutory requirement nor to decide constitutional issues.

The hospital appeals, arguing for the first time that section 766.302(2)'s differing birthweight requirements violate state and federal equal protection guarantees because the law impermissibly discriminates "among members of the class of full-term infants who have suffered a birth-related neurological injury."

II.

We limit our review of the hospital's constitutional claims to a facial challenge, which may be raised for the first time on appeal, see Key Haven

4

Associated Enterprises Inc. v. Board. of Trustees of Internal Improvement Trust Fund, 427 So. 2d 153, 157-58 (Fla. 1982); and the hospital is foreclosed from raising an as-applied challenge because it never reserved the right to have an administrative hearing to flesh out the factual basis of an as-applied claim. See Samples v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 114 So. 3d 912, 914 (Fla. 2013) (noting that "the Samples reserved the right to have a hearing before an ALJ to raise the issue of the interpretation and constitutionality [on equal protection grounds] of section 766.31(1)(b)1[, which grants a single award of 100k regardless of the number of parents claiming the amount]"); see also Fla. Dep't of Agric. & Consumer Servs. v. Mendez, 98 So. 3d 604, 608 (Fla. 4th DCA 2012) ("Unlike facial challenges to a statute, as-applied challenges are subject to the rules of preservation.") (citations omitted).

We also limit consideration of the hospital's constitutional challenge to the federal constitution because the hospital is not a "natural person" within the protection of our state constitution. Art. I, § 2, Fla. Const. The term "natural" was interposed to clarify that the provision does not apply to corporations, only to private persons. See generally Talbot D'Alemberte, The Florida State Constitution: A Reference Guide (1991); cf. Alexis Inc. v. Pinellas Cnty., Fla., 194 F. Supp. 2d 1336, 1342 (M.D. Fla. 2002) (corporations are "'persons' within the meaning of

5

the equal protection and due process of law clauses of [the Fourteenth Amendment]") (citations omitted).

III.

We first address the threshold issue of standing. See McCary v. Myers, 125 So. 3d 333, 336 (Fla. 1st DCA 2013). Despite the Association's arguments to the contrary, the hospital has standing because it has a direct economic interest in avoiding being pulled into civil litigation over liability for injuries that are covered by NICA, whose purpose "is to limit a participating physician's exposure to civil liability in cases where the doctor's professional involvement could make him or her a defendant in a lawsuit." See Fluet v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 788 So. 2d 1010, 1012 (Fla. 2d DCA 2001). Absent standing, hospitals and physicians would be unable to defend their interests and avoid potential civil liability, a result that the NICA statute does not support.

In fact, as a matter of course hospitals are frequently permitted to intervene in these types of cases even though it's the parent or guardian who initiates a petition for NICA benefits. The reason they are permitted to intervene is because under Florida's Administrative Procedures Act, third-party standing is triggered by a showing that that party has "substantial interests" that will be determined in the proceeding. See § 120.52(13)(b), Fla. Stat. (defining a "party" to include "[a]ny other person . . . whose *substantial interests* will be affected by proposed agency

6

action, and who makes an appearance as a party") (emphasis added). What better example of one's "substantial interests" being affected than an adverse administrative decision that potentially exposes a hospital to substantial civil liability.

Constitutional standing differs from APA standing, but tort immunity is a substantial enough interest in these cases that a hospital should be permitted to raise a federal equal protection constitutional challenge to NICA's provisions that potentially negate the immunity the statute was designed to provide. See § 766.301(1)(a), Fla. Stat. (the Legislature recognizing that "physicians practicing obstetrics are high-risk medical specialists for whom malpractice insurance premiums are very costly, and recent increases in such premiums have been greater for such physicians than other physicians"); § 766.302(2), Fla. Stat. (explaining that the remedies under NICA preclude all other legal remedies available to an injured infant, the parents, or legal representative). Thus, we conclude that the hospital has standing to raise its facial federal constitutional challenge under the equal protection clause.

## IV.

We review the constitutionality of a statute, a pure question of law, de novo. City of Ft. Lauderdale v. Dhar, 185 So. 3d 1232, 1234 (Fla. 2016). Mixed questions of law and fact that ultimately determine constitutional rights involve a

7

two-step approach: (1) deference to the lower tribunal on issues of historical fact, but (2) de novo review of the constitutional issue. Id. "As in all constitutional challenges, the statute comes to the Court clothed in the presumption of correctness and all reasonable doubts about the statute's validity must be resolved in favor of constitutionality." Id. Because neither a suspect class nor fundamental rights are implicated here, we review the purported classifications under a rational basis test, asking whether section 766.302(2)'s classifications are rationally related to a legitimate government purpose. Doe v. Moore, 410 F.3d 1337, 1346 (11th Cir. 2005). A statute is constitutional under the rational basis test when there is any reasonably conceivable set of facts that could provide a basis for it. Id.; see also Amerisure Ins. Co. v. State Farm Mut. Auto. Ins. Co., 897 So. 2d 1287, 1290 (Fla. 2005) (rational basis test "provides the most lenient level of scrutiny under the federal and state equal protection clauses").

We conclude that there is no equal protection violation for two reasons. First, the hospital has failed to show that single gestations and multiple gestations involve similar situations for equal protection purposes. Second, even assuming equal protection analysis applies, section 766.302(2) withstands constitutional scrutiny because the statutory weight distinction is rationally related to preserving the actuarial soundness of the Plan's no fault coverage. See Samples, 114 So. 3d at 917 (finding the portion of the Plan, which limited the parental award to $100,000

8

per claim, as opposed to per parent, rationally related to maintaining the actuarial soundness of the Plan).

Turning to the first reason, the gestational weight requirements are key elements in the definition of "birth-related neurological injury," and a uniform classification of all infants meeting this definition. The distinction in the weight requirements for single gestation (one baby) versus multiple gestation (twins or more) of 2,500 grams and 2,000 grams, respectively, was introduced by chapter 2001-277, Laws of Florida (2001) (inserting into section 766.302(2) the phrase "for a single gestation or, in the case of a multiple gestation, a live infant weighing at least 2,000 grams" immediately preceding "2,500 grams"). Prior to this amendment, the statute did not provide for "multiple gestation" infants at all. See, e.g., § 766.302(2), Fla Stat. (2001) ("'Birth-related neurological injury' means injury to the brain or spinal cord of a live infant weighing at least 2,500 grams at birth caused by oxygen deprivation or mechanical injury occurring in the course of labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently and substantially mentally and physically impaired.").

It's conceivable that the Legislature recognized that multiple gestation infants have a lower birth weight than single gestation infants because the former must share womb space and nutrition. See Doe, 410 F.3d at 1346. And the addition

9

of "multiple gestation infants" with a differential weight requirement, reflects the Legislature's recognition that the two deliveries *are not* similarly situated. As such, the hospital has not established a basis for an equal protection claim. Duncan v. Moore, 754 So. 2d 708, 712 (Fla. 2000) ("Equal protection is not violated merely because some persons are treated differently than other persons. It only requires that persons similarly situated be treated similarly."); (citing City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike.")).

Even if it did, however, the rational basis test is met: NICA's weight distinctions withstand constitutional scrutiny because they're rationally related to maintaining the actuarial soundness of its no fault coverage. In 2004, the Florida Legislature considered, and ultimately rejected, reducing the weight requirement of single gestation infants from 2,500 grams to 2,000 grams. The Legislature's decision *not* to move forward with such a reduction, was made after it commissioned a report from the Florida Office of Program Policy Analysis & Government Accountability ("OPPAGA"), titled, NICA Eligibility Requirements Could Be Expanded, But the Costs Would Increase Significantly, Report No. 04-04 (Jan. 2004), http://www.oppaga.state.fl.us/reports/pdf/0404rpt.pdf. As the title

10

of its report suggests, the OPPAGA concluded that reducing the weight requirement from 2,500 to 2,000 grams for single gestation births would increase costs; in fact, it concluded that the change would result in approximately thirteen additional claims per year that "would yield additional annual claims expenses of between $18.5 million and $24.2 million." Id. at 7. The report continued that "[b]ecause NICA covers all medically necessary expenses over the lifetime of each child, an increase in the number of claims w[ould] subsequently increase program expenses for providing services to claimants." Id. at 8. This would include, based on then-current information, an increase in premiums to all participating NICA health care physicians from $5,000 per year to $17,415 per year, among other significant increases. Id. at 11. Such increases would have undermined the express purpose of the Plan to provide no fault compensation for birth-related neurological injuries to infants—see sections 766.301-.316, Florida Statutes—by making the financial costs untenable.

NICA's actuarial soundness has been expressly recognized as a legitimate State interest sufficient to withstand equal protection challenges. See, e.g., Samples, 114 So. 3d at 917 (finding constitutional the Plan's $100k award per claim (as opposed to per parent), and holding that Florida "has a legitimate interest in the actuarial soundness of the Plan" because "limiting the parental award to $100,000 per claim is rationally related to maintaining the actuarial soundness of

11

the Plan"). The Legislature conceivably chose not to reduce the weight requirements for single gestation infants to further the legitimate governmental interest of preserving the availability of exclusive benefits on a no-fault basis for a limited class of catastrophic injuries. See Doe, 410 F.3d at 1346. As such, we hold that section 766.302(2)'s weight requirements and distinctions between single and multiple gestational births meet the rational basis test.

AFFIRMED.

MAKAR, JAY, and M.K. THOMAS, JJ., CONCUR.